1
2
3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOE LOUIE GOMEZ,

              Petitioner,

    v.

STUART SHERMAN,

              Respondent.

Case No.  14-cv-01337-EMC

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

## I.    INTRODUCTION

Joe Louie Gomez filed this *pro se* action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 to challenge his state court conviction for burglary, robbery and false imprisonment. Respondent has filed an answer to the petition and Mr. Gomez has not filed a traverse.  For the reasons discussed below, the Court denies the petition.

## II.    BACKGROUND

The California Court of Appeal described the evidence presented at the bench trial:

> Around 2:00 a.m. on September 13, 2008, [Shawna] vonStockhausen was asleep in her bedroom on the second floor of her San Jose townhouse. She awoke to find a man standing beside her bed who was looking around at her and at the items she had on her dresser. When she tried to get out of bed, the man held her down and tried to put his hand over her mouth. He addressed her by name, told her to calm down, and said that a friend had given him a key to her house. She had never seen the man before. She asked him to let her up, but he said he could not do that because she would call the police. She eventually persuaded him to let her lock herself in the bathroom. She waited in the bathroom until she felt that the man had left and was not returning. During that time, she heard some items being taken and her sliding glass door open and close.
>
> It was 2:40 a.m. when vonStockhausen left her bathroom. She went to a neighbor's house and called the police. She returned to her house with the police later that morning and noticed that the screen

had been removed from her kitchen window; one of her kitchen knives, some movie tickets, her keys, her wallet, and her cell phone were missing; an armrest cover from her sofa was in her bedroom; and a clean sock that had been on the floor of her bedroom was on her bed. The sock had a dark stain on it. She later determined that a video camera and a digital camera were missing. The following morning her kitchen knife was found by police in the yard of a nearby home. It was the only item taken from her home that she got back.

VonStockhausen could not say "for certain" that defendant was the man she had seen in her townhouse, but she testified that he "looks similar to" that man. She remembered that the man's hair was cut short and was combed forward in the front, that he had a "squarish" jaw line, that his eyes were very round and "almost puffy," that he sounded Hispanic but did not have a very heavy accent, and that he wore what looked like a white gardening glove on his hand and a dark long-sleeved dress shirt. She was later shown three separate photographic lineups. She picked a man out of the first lineup, but she said that she was only 65 percent sure that he might be the man she saw in her home. Defendant's photo is in the third lineup, but she does not remember which two photos she picked out of that lineup.

On December 2, 2010, the parties stipulated that the transcript of the preliminary examination testimony of Officers Kasey Padia and Brian Jeffrey would be submitted in lieu of their live testimony. The officers' preliminary examination testimony was as follows.

Around 2:50 a.m. on September 13, 2008, Officer Padia responded to vonStockhausen's address. VonStockhausen told him that a man had entered her home. She said that the man's voice sounded Hispanic, and that he had a medium build and short hair. She said that car keys, a purse, movie passes, and a kitchen knife were taken.

Around 8:43 a.m. on September 13, 2008, Officer Jeffrey responded to an address in San Jose, where he was instructed to collect a kitchen knife from some bushes. He took DNA swabs from the handle of the knife before booking it into evidence. He then responded to vonStockhausen's address, where he collected a sock that was lying on top of the bed.

On December 6, 2010, vonStockhausen's father, James von-Stockhausen, testified that he was the one who obtained and gave to his daughter the movie passes that were taken from her home. He gave a San Jose police officer the serial numbers of those passes.

Shirley Overson testified that her husband was the one who discovered the kitchen knife in the bushes of their home on the morning of September 13, 2008. He showed her that the knife was in the dirt under some foliage outside their front door, and she immediately called the police.

Thanh Vu testified that her family has a booth at the Capitol Expressway flea market. While working there one weekend, a man gave her and her sister movie passes. They used them on September

**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

15, 2008. She later picked a photo out of a photographic lineup, but she was not able to identify defendant at trial as the man who gave her the passes.

Melissa Munich testified that she became vonStockhausen's roommate in September 2008. She and her father moved some of her things into vonStockhausen's home on September 12, 2008. She did not have any friends help her move and she did not provide a key to the home to any other person.

San Jose Police Detective John Mitchell testified that in October 2009, he received a report from the Santa Clara crime lab regarding a CODIS hit on some DNA that had been submitted in this case. Based on the information in the report, he scheduled a meeting with defendant. During their conversation, the detective told defendant that he was investigating this incident. Defendant declined to talk about the incident but he consented to having the detective do a DNA swab. The detective booked the swab into evidence and then took it to the crime lab. In March 2010, the detective prepared a photographic lineup that he showed to Thanh Vu. Vu picked defendant's photo out of the lineup.

On December 8, 2010, San Jose Police Officer Scott Morasci testified that he met with Thanh Vu at a movie theatre on September 15, 2008, after the manager of the theatre reported that Vu had used stolen tickets to get into the theatre. Vu told the officer how she had obtained the tickets.

San Jose Police Officer Brian Pettis testified that vonStockhausen told him on September 13, 2008, that movie passes had been taken from her home. She said that she had received the passes from her father. The officer met with vonStockhausen's father, and the officer made a note of the serial numbers of the missing tickets. He also met with the theatre manager. Officer Pettis was also the officer who showed vonStockhausen the knife found in the Oversons' front yard. VonStockhausen identified the knife as the one that had been taken from her home.

The parties stipulated that defendant was arrested on September 13, 2008. San Jose Police Officer Anthony Serrano then testified that he interviewed defendant in jail on September 16, 2008, as a suspect in a sexual assault investigation. During that interview, defendant said that he worked at the flea market and went to a movie theatre on the day before his arrest. He said that he got free tickets to the theatre from someone while he was there.

After the lunch recess, defense counsel requested a continuance so that she could contact Ryan Vachon, "the witness whom we were trying to stipulate around." Vachon was attending an out-of-state law school and was in the middle of final exams. The prosecutor objected to a continuance, in part because counsel had already "conducted her own evaluation of the work that was done." Defense counsel stated that all she needed was enough time to allow her investigator to talk to Vachon on the telephone, maybe as little as "15, 20 minutes." Following a discussion at the bench, the court ruled that it would "give counsel opportunity to have their

3

1
2
3

investigator speak with the witness in question and to report back....
[¶] In the meantime, it appears that both sides are prepared to go
forward with the remaining witness for the People, whatever
stipulations have been agreed to; is that correct?" Both counsel
responded "Yes."

4
5
6
7
8
9
10
11
12
13
14
15
16

Lynne Burley, a supervising criminalist and the technical leader of
the DNA unit of the Santa Clara crime lab, then testified as an
expert in the areas of screening for biological material and DNA
analysis. Burley testified that she did not perform the DNA analysis
in this case. Ryan Vachon, who has since left the lab, performed the
analysis. Burley reviewed Vachon's case notes and report packet.
The DNA profile generated from one of the swabs of the knife was
searched in Santa Clara County's database on September 29, 2009.
At the time of the search, the profile matched a profile from a
cigarette butt in an unassociated case. That match was reported to
the police agency. On February 19, 2010, Detective Mitchell gave
the lab a DNA sample from defendant. Vachon compared that
sample to the DNA profile from the knife. Burley reviewed the
analysis of that comparison and concluded, consistent with Vachon,
that defendant is the source of the DNA recovered from the swab of
the knife. A DNA analysis of the sock was performed on March 19,
2010. Vachon compared that analysis to defendant's sample, and
Burley reviewed his analysis. Burley concluded, consistent with
Vachon, that defendant is the source of the DNA recovered from the
sock. Vachon concluded, and Burley agreed, that defendant could be
excluded from the DNA mixture from several people that was taken
from the armrest cover. No sample of the DNA swab from the knife
remains; Vachon had to use the entire swab in order to get a DNA
profile. Vachon's tests ruled out the possibility that the stain on the
sock was blood, but he did not test it for saliva or semen.

17
18
19

After the prosecution rested, the defense rested without calling any
witnesses. However, defense counsel asked that "the record reflect
that—that Dr. Simon Ford was actually present during Ms. Burley's
testimony, and I consulted with him...." After the court heard
argument from the parties, the matter was submitted.

20
21
22
23
24
25
26

On December 9, 2010, the court reopened the matter to allow
defense counsel to submit an additional exhibit into evidence.
Defendant admitted all the prior allegations. The court found
"beyond all reasonable doubt that the evidence, both the laboratory
evidence, and the circumstantial evidence establishes that
[defendant] was the party who committed the offenses." "I find the
defendant guilty of each of the three counts beyond a reasonable
doubt." "Further, the special allegation pursuant to Penal Code
Section 667.5(c)(21), the further allegation that someone not an
accomplice of the defendant was present in the residence during the
commission of the burglary, the Court is satisfied beyond a
reasonable doubt and does find that allegation true."

27
28

*People v. Joe Louie Gomez*, Case No. H036812, 2011 WL 5443435, at *1-4 (Cal. Ct. App. Nov.

10, 2011).

4

United States District Court
For the Northern District of California

1    On April 11, 2011, Mr. Gomez was sentenced to thirteen years in state prison.

2    Mr. Gomez appealed.  Appointed counsel filed a *Wende* brief,[1] and Mr. Gomez filed a

3    supplemental brief in the California Court of Appeal.  The California Court of Appeal affirmed

4    Mr. Gomez's conviction in 2011, and the California Supreme Court denied his petition for review

5    in 2012.  Mr. Gomez also filed unsuccessful petitions for writ of habeas corpus in the state courts.

6    On March 24, 2014, Mr. Gomez filed a petition for writ of habeas corpus in this court.  His

7    petition asserted the following claims:  (1) Mr. Gomez's Fourteenth Amendment right to due

8    process was violated when the conviction was obtained as a result of "outrageous governmental

9    misconduct" in connection with DNA evidence, Docket No. 1 at 11; (2) Mr. Gomez was denied

10   his rights under the Confrontation Clause when lab reports were admitted without him having the

11   opportunity to cross-examine the author; (3) Mr. Gomez was denied due process because the

12   evidence was insufficient to support the conviction; (4) Mr. Gomez received ineffective assistance

13   of trial and appellate counsel when counsel failed to investigate and present an alibi witness and

14   DNA evidence; and (5) there was cumulative error.  Respondent filed an answer to the petition.

15   Mr. Gomez did not file a traverse, and the deadline by which to do so has long passed.

16   ### III.   JURISDICTION AND VENUE

17   This Court has subject matter jurisdiction over this action for a writ of habeas corpus under

18   28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the petition

19   concerns the conviction and sentence of a person convicted in Santa Clara County, California,

20   which is within this judicial district.  28 U.S.C. §§ 84, 2241(d).

21   ### IV.   STANDARD OF REVIEW

22   This Court may entertain a petition for writ of habeas corpus "in behalf of a person in

23   custody pursuant to the judgment of a State court only on the ground that he is in custody in

---

[1] Under California's *Wende* brief procedure*, see People v. Wende*, 25 Cal. 3d 436 (1979), counsel, upon concluding that an appeal would be frivolous, (1) files a brief in the appellate court that summarizes the procedural and factual history of the case, (2) attests that she has reviewed the record, explained her evaluation of the case to her client, provided the client with a copy of the brief, and informed the client of his right to file an *in propria persona* supplemental brief, and (3) requests that the appellate court independently examine the record for arguable issues.  The appellate court, upon receiving a *Wende* brief, conducts a review of the entire record and affirms if it finds the appeal to be frivolous.

violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review.  A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Id.* at 411.  "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable.'" *Id.* at 409.

## V. <u>DISCUSSION</u>

A.    <u>Claim of Outrageous Government Misconduct</u>

1.    <u>DNA Evidence</u>

a.    <u>Background</u>

Mr. Gomez claims that his right to due process was violated when the government engaged in outrageous misconduct by planting DNA evidence on a sock and using that evidence at trial. His theory is that, since one of two buccal swabs with his DNA went missing, some unidentified governmental agent must have taken the DNA from that swab and transferred it to a sock

United States District Court
For the Northern District of California

1  recovered from the victim's bedroom to link Mr. Gomez to the crime.

2      Mr. Gomez states that he provided two buccal swabs (i.e., one from each cheek) to

3  Detective Mitchell.  Detective Mitchell's testimony and written report refer to two buccal swabs

4  being obtained, with each swab being placed in a separate small envelope, and the two small

5  envelopes being placed in a single larger manila envelope, which was sealed with tape.  However,

6  the crime lab report reflects that a tape-sealed manila envelope received at the Santa Clara County

7  Crime Lab contained only one buccal swab from Mr. Gomez.

8      Mr. Gomez argues that a series of emails between Detective Mitchell and lab technician

9  Ryan Vachon show that his DNA was planted on the sock because, after Detective Mitchell

10  informed Mr. Vachon that it would be helpful to find some DNA on something from inside the

11  victim's home, Mr. Gomez's "DNA materialized on the sock found inside the house."  Docket No.

12  1 at 27.  Mr. Gomez further argues that the impropriety is apparent from the fact that Mr. Vachon

13  had no need to know the information Detective Mitchell provided him in the emails.

14      The Santa Clara County Superior Court rejected Mr. Gomez's habeas claim regarding the

15  DNA evidence without discussion.  Although the superior court did not separately address the

16  planted DNA claim, the court mentioned the argument in connection with Mr. Gomez's contention

17  that counsel was ineffective in not pursuing the argument.  The superior court explained that even

18  if there was a problem as to the "chain of evidence" for the buccal swab and even if that problem

19  would have cast doubt on the sock DNA, Mr. Gomez had not shown prejudice on an ineffective

20  assistance of counsel claim because his DNA also was found on the knife taken from the residence

21  and Ms. Vu had identified him in a photo lineup as the man who had given her the movie tickets

22  taken from the residence.  Docket No. 1 at 165-66.

23          b.    Analysis

24      A fundamental principle guiding the conduct of the prosecutor, as the representative of a

25  sovereign in this country, is "not that it shall win a case, but that justice shall be done."  *Berger v.*

26  *United States*, 295 U.S. 78, 88 (1935).  From this principle flow the rules that the prosecutor may

27  not hide evidence and may not let false evidence go uncorrected at trial.  *See generally Strickler v.*

28  *Greene*, 527 U.S. 263, 280-82 (1999).  When a prosecutor obtains a conviction by the use of

testimony or evidence that he knows or should know is false, the conviction must be set aside if there is any reasonable likelihood that the testimony could have affected the judgment of the jury. *See United States v. Agurs*, 427 U.S. 97, 103 (1976); *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (same result obtains when State, although not soliciting false evidence, allows it to go uncorrected when it appears). To prevail on a claim of prosecutorial misconduct for use of false witness testimony or evidence, a petitioner must show that (1) the testimony or evidence was actually false, (2) the prosecution knew or should have known that the testimony or evidence was false, and (3) the false testimony or evidence was material. *Henry v. Ryan*, 720 F.3d 1073, 1084 (9th Cir. 2013); *see also Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (prosecutor's action in presenting false evidence to the jury and by failing to correct the record violated petitioner's rights).[2]

For a *Napue* claim, false testimony or evidence is material if there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States. v. Agurs*, 427 U.S. 97, 103 (1976). "This materiality standard is, in effect, a form of harmless error

---

[2] Mr. Gomez cites two Supreme Court cases outside the *Napue* line of cases in support of his first claim, but they do not apply to the sort of circumstances he alleges. His citation to *Williams v. Illinois*, 132 S. Ct. 2221, 2239 (2012), does not help him because it was not a due process case and instead addressed the question of whether a Confrontation Clause violation occurred when an expert testified to his opinions about DNA evidence he had not personally tested. A case that might be clearly established law for a claim under one amendment should not be used to determine that the law is clearly established for purposes of a claim under another amendment. *See Premo v. Moore*, 562 U.S. 115, 128 (2011) (9th Circuit erred in transposing coerced confession case into the novel context of governing law for an ineffective assistance of counsel claim). His citation to *United States v. Russell*, 411 U.S. 423 (1973), also provides little help to him because it concerned an entrapment issue. In *Russell*, the Court considered whether a government informant's contribution of an ingredient used in an ongoing drug-manufacturing enterprise amounted to entrapment. The Court held that it did not. The Court observed: "While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, *cf. Rochin v. California*, 342 U.S. 165 (1952), the instant case is distinctly not of that breed." *Russell*, 411 U.S. at 431-32. The *Rochin* case cited in *Russell* found that police action in forcing the mouth of a suspect open to retrieve swallowed pills and then forcing him to have his stomach pumped was so shocking to the conscience and so violative of respect for personal immunities as to violate due process. Here, Mr. Gomez does not contend that there was an impropriety in gathering the DNA swabs; he voluntarily provided the samples to the police.

United States District Court
For the Northern District of California

1  review, but a far lesser showing of harm is required under *Napue*'s materiality standard than under

2  ordinary harmless error review.  *Napue* requires [the court] to determine only whether the error

3  *could* have affected the judgment of the jury, whereas ordinary harmless error review requires [the

4  court] to determine whether the error *would* have done so."  *Dow v. Virga*, 729 F.3d 1041, 1048

5  (9th Cir. 2013) (citations omitted).

6        Mr. Gomez's claim falters on the first prong of a *Napue* claim because he does not show

7  that the DNA evidence was actually false.  His assertion that the DNA evidence was tainted or

8  false is simply speculative.  Mr. Gomez points to the missing buccal swab, and then urges the

9  Court to infer from a series of emails that someone put the buccal swab DNA on the sock.  Mr.

10 Gomez ultimately shows nothing more than a missing buccal swab, and that simply is not enough

11 to show false DNA evidence was used against him.

12       The emails do not prove Mr. Gomez's theory.  The emails in question are seven emails

13 between DNA lab analyst Ryan Vachon and Detective Mitchell over the course of several months.

14 (The emails were admitted into evidence upon a stipulation at trial.  RT 119.)  Mr. Vachon did the

15 testing of the DNA samples from the crime scene, and Detective Mitchell investigated the crimes.

16 The emails went in this order:

17       (1)     On December 3, 2009, Mr. Vachon wrote to Detective Mitchell to discuss

18 the status of the case.  Mr. Vachon wrote that an "unknown male profile was generated from a

19 swab of the handle of a knife used during the burglary.  We have some items of evidence

20 remaining in the lab that have not been tested (this is mostly bedding materials) and I wanted to

21 know if any work needs to be done on the remaining items.  [¶]  Also, the profile that was

22 generated from the knife handle had a CODIS hit to a Joe Louie Gomez. . . . We will need a

23 reference sample of Joe Gomez to be submitted to the laboratory before we can confirm the source

24 of the DNA."  Docket No. 1 at 68-69.  (CODIS is an acronym for the Combined DNA Index

25 System, a national DNA database. *United States v. Renyard*, 473 F.3d 1008, 1011 (9th Cir.

26 2007).)

27       (2)     On December 23, 2009, Detective Mitchell responded to Mr. Vachon that

28 the case was still open, and he would "see what [he could] do about the sample which may involve

1  a search warrant and/or arrest warrant.  Great work!"  *Id.* at 68.

2       (3)    On February 23, 2010. several days after Mr. Gomez provided the buccal

3  swabs, Detective Mitchell wrote to Mr. Vachon:  "I submitted a control sample from Gomez on

4  Friday.  What is the status of the other property.  We need to have it processed as well.  Can you

5  give me an update please?"  *Id.*

6       (4)    On February 24, 2010, Mr. Vachon responded to Detective Mitchell that he

7  had received the request to test the buccal swab from Mr. Gomez and would begin processing the

8  swab early the next week.  As to the remaining evidence, there was an armrest cover, a sock, two

9  pillow cases, two sheets, and a white blanket listed as having been submitted for examination.  Mr.

10  Vachon wrote:  "Has any additional information become available in regards to these items?  You

11  mentioned in the voicemail that you left me that there may be a sexual assault component to the

12  case.  The police report didn't mention this, so any additional details that you have would help

13  with my examination."  *Id.* at 67-68.

14       (5)    On February 24, 2010, Detective Mitchell responded to Mr. Vachon:

15  The original '07 hit came back of that cigarette butt mentioned in
16  your report.  That was found in the driveway of a house in which an
   unknown suspect entered the house and [redacted by Gomez].  The
17  detectives put together a line-up but no ID so they closed it.

18  The case we are working on occurred on 9-17-08 about 0230 hours.
   Later on that same day about 2100 hours, Gomez was arrested in a
19  movie theatre which is located between his house and our victim's
   for some [redacted by Gomez] that resulted in him serving an 11
20  month jail sentence and [redacted by Gomez].  He is also on parole
   for ADW.

21  Gomez has a long history of [redacted by Gomez] assault offenses,
22  property crimes such as burglary and dope of course.

23  I have been thus unable to get the case filed solely based on the
   knife which was found outside the house.  *Obviously if there is any*
24  *DNA on something found inside the victim's house, that would be*
   *very helpful towards the case.*

25  So I consider this guy to be a dangerous [redacted by Gomez] who
26  may have been scared off by my victim and is certainly a subject of
   interest in the case with the [redacted by Gomez].[3]  *Id.* at 67
27  (emphasis added).

28  ---
   [3] Mr. Gomez submitted a declaration stating that he had "redacted portions of the text in

(6)      On April 1, 2010, Detective Mitchell wrote to Vachon:

> Can you give me a call. . . . I was hoping for an update on the analysis of the other items.  One of the suspects, Maldonado, is on felony probation for dope and attempted robbery in two separate cases and his probation is coming up.
>
> I am not excluding either GOMEZ and MALDONADO as potential contributors to any of the evidence you are examining.  I have submitted buc[c]al swabs for both and confirmed with CODIS that JOE GOMEZ . . . was the contributor on the sample you referenced as originating on the cigarette butt from the previous sex assault case from '05.  *Id.* at 66.

(7)      On April 2, 2010, Mr. Vachon wrote to Detective Mitchell to provide an

update on the tests:

> I have finished analyzing the Gomez reference, as well as the armrest cover (Item PWPK) and the athletic sock (Item PWPL), and have been given the go ahead to give you verbal results while I await my report to get through review.
>
> I got a mixture of DNA on the armrest cover from which I have *excluded* both Maldonado and Gomez.
>
> On the athletic sock, I was able to generate a profile and determined that Gomez is the *source* of it.  The Gomez reference also confirmed that he is the *source* of the DNA on the handle of the knife (Item PWPN-3).
>
> At this time, I have not found any indication that Maldonado's DNA is on any of the evidence items.
>
> If you have any questions, I'm happy to answer them for you!

Docket No. 1 at 66.

Mr. Gomez homes in on Detective Mitchell's statement in email # 5, "I have been thus

---

consideration of the environment I was living in at the time and the sexual nature of the events described in those section[s]." Pet. Ex. B.  The redactions, however, deprive the email of some important contextual information, mostly that Mr. Gomez's previous sex crimes made him of great concern to Detective Mitchell.  For example, Mr. Gomez deleted the reference to the reason for his arrest later on the day of the burglary.  The police had information that Mr. Gomez sat down immediately next to three young girls in a movie theatre with 130 other available seats; during a daylight scene in the movie "the girls looked over at the defendant and noticed his pants were around his ankles. A newspaper covered his lap, and his hand was 'fidgeting' in his lap."  CT 193. In the third paragraph, Mr. Gomez redacted that he had a history of sex offenses.  *See* CT 191 (on July 5, 2005, police responding to a peeping Tom report "found the defendant with his pants unzipped standing near the first floor balcony window of the victim's apartment"; on June 6, 2005, he was observed sitting in someone else's car with his pants down and holding a pornographic magazine).  *See also* CT 501.

United States District Court
For the Northern District of California

1   unable to get the case filed solely based on the knife which was found outside the house.

2   Obviously if there is any DNA on something found inside the victim's house, that would be very

3   helpful towards the case." *Id.* at 67.  Mr. Gomez then suggests that, since his DNA "materialized

4   on the sock" after this email, this email must have prompted someone to take the buccal swab and

5   transfer that DNA onto the sock.  Docket No. 1 at 27.  But his assertion that someone helped the

6   case along by planting the DNA on the sock is nothing more than speculation, and it is

7   unreasonable speculation in light of the record.  Several reasons would support the state court's

8   conclusion that the email trail does not show that the DNA evidence was planted on the sock.

9        First, Detective Mitchell's comment reflected the reality that it would be more difficult to

10  prove a burglary[4] when the only evidence was that the defendant had contact with a knife found

11  outside the residence, and that a prosecutor would not want to file a case so easily defeated.  *Cf.*

12  *Mikes v. Borg*, 947 F.2d 353, 357 (9th Cir. 1991) (in a case dependent on defendant's fingerprints

13  on a turnstile post used as a murder weapon and found next to the body in the victim's basement,

14  "there must, at the very least, be sufficient evidence in the record to permit the factfinder to

15  determine when the fingerprints were impressed; otherwise, any conviction would be based on

16  pure speculation" because the turnstile post had months earlier been in use in a store and

17  accessible to the public).  For example, the defense in a case where a defendant is linked to a

18  burglary only by his contact with an item in a nearby yard could argue that the defendant may

19  have found the item in the yard and discarded it after examining it, or the defense could argue that

20  a third party gave the item to the defendant who then discarded it in the yard.  But those sorts of

21  arguments cannot be made when the item with the defendant's DNA is found *inside* the burgled

22  residence.  At the time Detective Mitchell wrote that a case could not be filed, the only known link

23  between Mr. Gomez and the burglary was the DNA on the knife, as Ms. Vu had not yet picked

24  Mr. Gomez out of a photo lineup.

25        Second, Mr. Vachon's February 24, 2010 email (i.e., email # 4) requesting details about

26

27  ─────────────────────────

[4] The court refers to the criminal episode as a burglary for ease of reference.  Although Mr. Gomez
28  was convicted of robbery and false imprisonment as well as burglary, the robbery and false
    imprisonment were part of the burglary episode.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    the crime suggests an effort to find out which of the several items of evidence he should prioritize

2    and whether he should look for particular substances.  At the time, the lab had sheets, pillowcases,

3    a blanket, an armrest cover and a sock for this case.  Testing all of the surfaces on all of those

4    items may have been unduly time-consuming, and his email reflects an effort to narrow his focus.

5    For example, had there been a sexual assault on the bed, Mr. Vachon might have chosen to first

6    test the sheets or a particular section of the sheets.

7           Third, the discussion of the facts of the crime and Mr. Gomez's history of sex offenses and

8    other criminal activity was relevant to Mr. Vachon's effort to prioritize the items of evidence to be

9    tested and provided context for Detective Mitchell's particular concern about this suspect.  A

10   reasonable reading of email # 5 is that Detective Mitchell was concerned that, although no sexual

11   assault had taken place in this residence, Mr. Gomez's sex offense history and his arrest within

12   hours after the burglary for lewd conduct in front of minors suggested Mr. Gomez might be

13   escalating and moving toward committing burglaries for the purpose of sexually assaulting the

14   inhabitants.[5]  While there is no evidence that Mr. Gomez committed this burglary for the purpose

15   of sexually assaulting the inhabitant, it would not have been unreasonable for Detective Mitchell

16   to be concerned about the possibility of escalating criminality, given the victim's statement that

17   she awoke to find Mr. Gomez in the bedroom looking at her and that Mr. Gomez had pressed her

18   against the bed when she initially tried to get away.

19          Finally, the state court could have determined that the inference that someone took Mr.

20   Gomez's DNA from the buccal swab and planted that DNA evidence on the sock was particularly

21   unreasonable because, before the buccal swab was provided by Mr. Gomez and before the sock

22   was ever tested, Mr. Gomez's DNA already had been found on the knife taken from the residence.

23   *Cf. Williams v. Illinois*, 132 S. Ct. 2221, 2239 (2012) (a defense theory of sloppy lab work is

24   weakened when other DNA tests have led to a DNA match).

25   _____

26   [5] Defense counsel later mentioned similar concerns in explaining to Mr. Gomez's appellate
     counsel why she had waived a jury trial.  Trial counsel wrote that, if there was a jury trial and Mr.

27   Gomez testified, his "arrest[s] for a variety of crimes that had sexual and violent overtones" would
     have caused his case to "take[] a severe turn for the worse, in my opinion.  The District Attorney

28   would have been able to plant the seed that this offense, but for some quick thinking on the part of
     the victim, could have easily turned into a sexual assault."  Docket No. 1 at 75.

United States District Court
For the Northern District of California

For all these reasons, it would not have been unreasonable for the state court to conclude that Mr. Gomez's claim that false DNA evidence was presented at his trial was only speculative and therefore insufficient to establish a *Napue* claim.  Conclusory assertions or speculation that evidence is false are not sufficient to make out a *Napue* claim.  *See Henry v. Ryan*, 720 F.3d 1073, 1084 (9th Cir. 2013) (finding that petitioner's conclusory assertion that any testimony inconsistent with the truth must be not only inaccurate but also perjured, does not constitute evidence sufficient to make out a *Napue* claim); *United States v. Aichele*, 941 F.2d 761, 766 (9th Cir. 1991) (*Napue* claim is not shown where defendant's contention that witness' statements during testimony "were perjured is mere speculation"); *see, e.g., United States v. DeMathews*, 60 F. App'x 19, 20 (9th Cir. 2003) (rejecting *Napue* claim because defendant's "allegation that Agent Orr testified falsely at trial is pure speculation"); *United States v, Morgan*, 2015 WL 6773933, at *11 (10th Cir. Nov. 6, 2015) (rejecting defendant's contention that there must have been an undisclosed side agreement in addition to a plea agreement based on favorable treatment witness received; no *Napue* claim shown because the defendant "merely speculates about undisclosed tacit agreements prior to his trial.  He points to no solid evidence of any such agreement.  The government's failure to prosecute either [the witness] or his daughter or to seek civil forfeiture of his assets is simply not enough."); *id.* at 13 ("Speculation is not enough" to show the existence of an agreement); *Abrante v. St. Amand*, 595 F.3d 11, 18 (1st Cir. 2010) (rejecting *Napue* claim where defendant "engage[d] in a series of speculations in support of his view that [two witnesses] gave false testimony, but he offer[ed] no evidence that would lead to the conclusion that the government *knew* that the testimony was allegedly false"); *Mickle v. Chappell*, 2014 WL 3866614, at *13 n.4 (N.D. Cal. Aug. 5, 2014) ("Petitioner speculates that Christensen changed his opinion after he received a letter from the prosecutor requesting clarification of his views. He asserts that Christensen was vulnerable because he had recently been discharged from his position as fire inspector for the Redwood City Fire Department. Such speculation does not establish that Christensen's testimony was false."). With the determination that no false evidence had been presented, the state court's rejection of Mr. Gomez's claim that falsified DNA evidence was presented at trial was not an unreasonable application of, or contrary to *Napue*, because the first element of a *Napue* claim

1    requires that the evidence be false.

2           Ultimately, Mr. Gomez has at most managed to show only a potential defect in the chain of

3    custody of the DNA swabs.  That would not have prevented the DNA evidence from being

4    admitted at trial because a "defect in the chain of custody goes to the weight, not the admissibility,

5    of the evidence introduced."  *United States v. Matta-Ballesteros*, 71 F.3d 754, 769 (9th Cir. 1995);

6    *see, e.g., United States v. Young*, 510 F. App'x 610, 611 (9th Cir. 2013) (DNA evidence was

7    admissible notwithstanding absence of evidence of the chain of custody because the possibility of

8    a break in the chain of custody goes to the weight, not admissibility of evidence); *United States v.*

9    *Seideman*, 485 F. App'x 190, 193 (9th Cir. 2012) (testimony from evidence control technician was

10   sufficient to authenticate clothing; "[a]lthough there were inconsistencies in the details provided in

11   the inventory sheets as well as in the testimony regarding the presence of absence of FBI

12   markings," these went to weight not admissibility of evidence).

13          2.      Laura Cordova's Statement

14          Mr. Gomez also asserts that government misconduct occurred because Detective Mitchell

15   lied when he wrote in a police report that Mr. Gomez's girlfriend, Laura Cordova, stated that Mr.

16   Gomez was not home on the night of the burglary.  In support of his assertion, Mr. Gomez submits

17   a December 10, 2013 declaration from Ms. Cordova stating that, when interviewed by Detective

18   Mitchell on April 2, 2010 about the whereabouts of Mr. Gomez on the "night of September 13,

19   2008," she told detective Mitchell "that Joe had been at home with me the entire night."  Docket

20   No. 1 at 129.[6]

21          Detective Mitchell did not testify at trial as to any statement made by Laura Cordova or as

22

23   _____

     [6] Interestingly, there are multiple incorrect dates in Ms. Cordova's declaration.  The crime
24   occurred on September 13, 2009, not September 13, 2008.  The declaration was dated December
     10, 2013; Mr. Gomez provides his own declaration (Docket No. 1 at 127) asserting that Ms.
25   Cordova's declaration should have been dated January 10, 2013 because he received it on January
     14, 2012 (which also appears to be an incorrect date because the declaration would not have been
26   written before he received it).  Detective Mitchell's report also has a date error, as he refers to
     asking about Mr. Gomez's whereabouts on the night of September 13, 2007.  Docket No. 1 at 181.
27   The date errors do not matter for present purposes, however, because no evidence was introduced
     at trial about Mr. Cordova's statement to Detective Mitchell.
28

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  to Mr. Gomez's whereabouts on the night of the crime.  In other words, regardless of what

2  Detective Mitchell wrote in his police report, he was not asked and did not testify as to where

3  Gomez was on the night of the crime or to any statement made by Ms. Cordova.  Mr. Gomez has

4  failed to show that the alleged misstatement was introduced at trial or otherwise had any impact on

5  his trial.  Because no evidence on this point was introduced at trial, and a *Napue* claim requires

6  that the false testimony or evidence be presented at trial, the state court's rejection of this claim

7  was not contrary to or an unreasonable application of clearly established Supreme Court

8  precedent.  Habeas relief therefore is not available on Mr. Gomez's due process claim.

9  B.      Confrontation Clause Claim

10         Mr. Gomez contends that his rights under the Confrontation Clause were violated when he

11  "was convicted on the basis of reports (i.e., lab reports) that were 'testimonial' in nature, without

12  petitioner having had the opportunity to cross-examine the author of the report."  Docket No. 1 at

13  11.  The materials in question pertained to the DNA testing that had been conducted by Mr.

14  Vachon.  At the time of trial, Mr. Vachon no longer worked for the lab and was taking final exams

15  at a law school in another state.

16         At trial, counsel stipulated to the admission of the DNA lab test results and some related

17  documents.  The documents were: (1) a CODIS letter dated July 23, 2007 (People's Ex. 8), (2) a

18  statement of qualifications of Mr. Vachon (People's Ex. 9); (3) two lab reports (People's Exs. 10

19  and 12); and (4) a major case exam request and worksheet for one of the lab reports (People's Ex.

20  11).  The prosecutor "offer[ed] the stipulation that to the contents of each of those exhibits and

21  further that samples referenced therein were handled in a scientifically approved manner, by

22  qualified individuals, using appropriate scientific techniques, which are generally accepted in the

23  scientific community."  RT 96-97.  Defense counsel accepted the stipulation, and the court

24  admitted the documents into evidence.  RT 97.  Then, Lynne Burley, a supervisor at the same lab

25  Mr. Vachon had worked at was qualified as an expert and testified about the DNA evidence in

26  general and the DNA evidence against Mr. Gomez.

27         The state courts rejected Mr. Gomez's Confrontation Clause claim without discussion.

28         The Confrontation Clause of the Sixth Amendment provides that in a criminal case the

16

accused has the right to "be confronted with the witnesses against him."  U.S. Const. amend. VI.
The ultimate goal of the Confrontation Clause "is to ensure reliability of evidence, but it is a
procedural rather than a substantive guarantee.  It commands, not that evidence be reliable, but
that reliability be assessed in a particular manner:  by testing in the crucible of cross-examination."
*Crawford v. Washington*, 541 U.S. 36, 61 (2004).  The Confrontation Clause applies to all
"testimonial" statements.  *See Crawford*, 541 U.S. at 50-51.  "Testimony . . . is typically a solemn
declaration or affirmation made for the purpose of establishing or proving some fact."  *Id.* at 51
(internal quotation marks and brackets omitted); *see id.* at 51 ("An accuser who makes a formal
statement to government officers bears testimony in a sense that a person who makes a casual
remark to an acquaintance does not."); *id.* at 68 ("Whatever else the term covers, it applies at a
minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and
to police interrogations.")

Two Supreme Court cases provide the clearly established law for the evidence at issue in
this case:  *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), and *Bullcoming v. New Mexico*,
131 S. Ct. 2705 (2011).  Both cases held that a lab report is a testimonial statement and subject to
the Confrontation Clause; critically, however, both cases also observed that the parties may
stipulate to the admission of lab reports without live testimony.  In *Melendez-Diaz*, the Supreme
Court held that a forensic laboratory report stating that a substance seized from a defendant was
cocaine was "testimonial" for Confrontation Clause purposes, and therefore the defendant had a
right to confront the analyst who prepared the report.  *Melendez-Diaz*, 557 U.S. at 311.  In
*Bullcoming*¸ the Court held that the Confrontation Clause was not satisfied when the prosecutor
called a surrogate (such as a coworker) rather than the actual analyst to testify to lab results.  "The
accused's right is to be confronted with the analyst who made the certification, unless that analyst
is unavailable at trial, and the accused had an opportunity, pretrial, to cross-examine that particular
scientist."  *Bullcoming*, 131 S. Ct. at 2710.

In *Melendez-Diaz*, the Supreme Court rejected the "dire predictions" of the dissent and the
State that requiring live analyst testimony would impose a great burden on the states.  Those
predictions "rely on various unfounded assumptions: that the prosecution will place into evidence

a drug analysis certificate in every case; that the defendant will never stipulate to the nature of the controlled substance; that even where no such stipulation is made, every defendant will object to the evidence or otherwise demand the appearance of the analyst." *Melendez-Diaz*, 557 U.S. at 325 n.10. The Court also explained that states were free to implement procedures (such as requiring the defendant to assert his Confrontation Clause rights pretrial after being notified of the prosecution's intent to use a forensic analyst's report) to minimize the purported burden of having an analyst at every trial where lab results were used. *Id.* at 325-26. The Court also observed that, even in courts that already adopted the rule that the defendant had the right to confront the analyst who prepared the report, there had not been a dramatic change in the landscape. This is "not surprising. Defense attorneys and their clients will often stipulate to the nature of the substance in the ordinary drug case. It is unlikely that defense counsel will insist on live testimony whose effect will be merely to highlight rather than cast doubt upon the forensic analysis. Nor will defense attorneys want to antagonize the judge or jury by wasting their time with the appearance of a witness whose testimony defense counsel does not intend to rebut in any fashion." *Id.* at 328.

Bullcoming reiterated that a Confrontation Clause problem could be avoided by stipulation when it described the *Melendez-Diaz* decision: "Absent stipulation, the Court ruled, the prosecution may not introduce such a report without offering a live witness competent to testify to the truth of the statements made in the report." *Bullcoming*, 131 S. Ct. at 2709; *see also id.* at 2718-19 (burden of Confrontation Clause rule is minimal in this context because only a fraction of cases go to trial and, when cases that go to trial involve lab reports, defendants regularly stipulate to the admission of the analysis).

In Mr. Gomez's case, the DNA testing lab reports were testimonial and ordinarily the preparing analyst would have had to appear at trial to be subjected to confrontation about those reports. However, the parties stipulated to the admission of the lab reports. The parties also stipulated that the contents and samples "were handled in a scientifically approved manner, by qualified individuals, using appropriate scientific techniques," RT 96-97. Their stipulation avoided the Confrontation Clause problem. *See, e.g., United States v. Moore*, 651 F.3d 30, 70 n.13 (D. D.C. 2011) (autopsy report by a medical examiner "was admitted into evidence pursuant

18

to stipulation, and thus raises no Confrontation Clause issue.  *See Bullcoming*, 131 S. Ct. at 2706–07”); *Wheeler v. United States*, 2015 WL 2344702, *8 (D. N.J. May 13, 2015) (stipulation by trial counsel to the admission of ATF firearms testing report at trial “operated as a waiver of his Confrontation Clause rights”); *United States v. Goodlow*, 389 F. App’x 961, 966 (11th Cir. 2010) (rejecting Confrontation Clause claim because defendant “actually stipulated to the admissibility of the tests without the presence of the lab technician at trial,” and the fact that the stipulation was made before the Supreme Court later clarified in *Melendez-Diaz* that a lab report was testimonial did not alter the result).  *Melendez-Diaz* and *Bullcoming* allowed the parties to stipulate to the admission of a lab report, and that is what occurred here.  The California court’s rejection of Mr. Gomez’s claim is not contrary to, or an unreasonable application of, *Melendez-Diaz* or *Bullcoming*.

Mr. Gomez argues that the state court’s failure to cite and discuss *Melendez-Diaz* or *Bullcoming* shows the state court’s summary rejection of his claim to be an unreasonable application of, or contrary to, Supreme Court precedent.  Docket No. 1 at 42.  He is wrong.  Unexplained as well as reasoned decisions are covered by § 2254(d).  “When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.”  *Harrington v. Richter*, 562 U.S. 86, 99 (2011).  It is not necessary for the state court to cite to the controlling Supreme Court cases for the state court decision to receive § 2254(d) deference.  *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).

C.      Insufficient Evidence Claim

Mr. Gomez contends that his conviction violates his due process rights because there was insufficient evidence to support the convictions for burglary, robbery, and false imprisonment.  Specifically, he challenges the adequacy of the proof that he was the person who entered the victim’s home on the night of the crimes.

This claim was first presented in Mr. Gomez’s state habeas petition, and the last reasoned decision on the claim was from the Santa Clara County Superior Court, which rejected it as procedurally barred.  Specifically, the superior court rejected the claim because an insufficiency-

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    of-the-evidence claim is not cognizable in a habeas action.  Docket No. 1 at 168 (citing *In re Reno*,

2    55 Cal. 4th 428, 505 (Cal. 2012) and *In re Lindley*, 29 Cal. 2d 709, 723 (Cal. 1947)).[7]   *Lindley*

3    stands for the proposition that a claim that the evidence was insufficient to support the verdict

4    must be raised on direct appeal and may not be raised in a petition for writ of habeas corpus.

5    Respondent does not argue that the *Lindley* procedural bar was independent or adequate to

6    preclude federal habeas review.

7          Where the state court has rejected a claim on procedural grounds, rather than on the merits,

8    § 2254(d) does not always apply.  If a federal court concludes that an asserted procedural bar was

9    not an independent and adequate ground for the state court decision, the federal court must

10   consider the claim on the merits; if the state courts never reached the merits of the claim, there is

11   no state court decision to which to defer and the federal court must review the claim de novo.

12   *Pirtle v. Morgan*, 313 F.3d 1160, 1167-68 (9th Cir. 2002).  Here, given the procedural rejection,

13   plus Respondent's decision not to argue that the procedural bar precludes federal review, the Court

14   cannot conclude that the claim is procedurally barred.  *Cf. Bennett v. Mueller*, 322 F.3d 573, 586

15   (9th Cir. 2003) ("because it is the State who seeks dismissal based on the procedural bar, it is the

16   State who must bear the burden of demonstrating that the bar is applicable – in this case that the

17   state procedural rule has been regularly and consistently applied").  As a result, this court must

18   consider the claim de novo rather than apply the deferential standard set out in § 2254(d).  This

19   turns out not to be very important to Mr. Gomez's claim, however, because the sufficiency of the

20   evidence test is extremely difficult for a petitioner to satisfy, even without the extra deference due

21   under § 2254(d).

22          The Due Process Clause "protects the accused against conviction except upon proof

23   beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

24   charged."  *In re Winship*, 397 U.S. 358, 364 (1970). A federal court reviewing collaterally a state

25   court conviction does not determine whether it is satisfied that the evidence established guilt

26   _____

27   [7] Although the superior court actually wrote that insufficient evidence "claims are not cognizable
     on appeal," the use of the word "appeal" was an obvious mistake.  The statement was made in a

28   rejecting a habeas claim rather than a direct appeal claim.  And the court cited two cases that stand
     for the proposition that insufficient evidence claims are not cognizable in a habeas action.

beyond a reasonable doubt, but rather determines whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt may the writ be granted. *See Jackson*, 443 U.S. at 324; *Payne*, 982 F.2d at 338. The "prosecution need not affirmatively 'rule out every hypothesis except that of guilt,'" and the reviewing federal court "'faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Wright v. West*, 505 U.S. 277, 296-97 (1992) (quoting *Jackson*, 443 U.S. at 326). The Ninth Circuit has explained that "'[c]ircumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction.' Nevertheless, 'mere suspicion or speculation cannot be the basis for creation of logical inferences.'" *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995) (internal citations omitted). "*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'" *Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) (citing *Jackson*, 443 U.S. at 319). In sum, "the only question under *Jackson* is whether [the jury's] finding was so insupportable as to fall below the threshold of bare rationality." *Id.* at 2065.

Viewing the evidence in the light most favorable to the prosecution and drawing the reasonable inferences therefrom in the prosecution's favor, a rational trier of fact could have concluded that Mr. Gomez was the intruder who committed the burglary, robbery and false imprisonment on September 13, 2008.

The DNA evidence was the strongest evidence showing that Mr. Gomez was the perpetrator. Evidence was presented that he was the source of the DNA found on the knife that had been taken from the residence on the night of the burglary. RT 106-08. Evidence was presented that he was the source of the DNA found on the sock left on the victim's bed on the night of the burglary. RT 106-108. Ms. Von Stockhausen testified that the sock was first

United States District Court

For the Northern District of California

deposited on the bed that night, and that the knife was taken from the home that night and she identified the knife found in a neighbor's yard as belonging to her.  CT 31, 32.  Mr. Gomez argues that the DNA evidence was "tainted with impropriety" and therefore should be disregarded.  As explained in Section A above, his theory of tainted DNA is speculative.  A rational trier of fact could have concluded that the DNA was deposited on the knife and the sock by the burglar that night.

The eyewitness testimony was not strong.  The victim, Ms. Von Stockhausen, testified that Mr. Gomez appeared to resemble the intruder, but she could not be certain.  CT 27.  Her ability to observe the intruder was hampered:  on the one hand, she did not have her contact lenses in at the time she saw him and she saw him in a darkened bedroom; on the other hand, she saw him from a distance of about one foot as he held her down and there was ambient light from an outside lighting source.

Ms. Vu changed her mind about her identification of Mr. Gomez as the man who gave her the stolen movie tickets.  A rational trier of fact could have believed her initial identification of Mr. Gomez as that man.  Ms. Vu attempted to use the movie tickets that had been stolen from the residence.  RT 34-36, 76.  She told the police that she had been given the tickets by a man at the flea market where her family worked.  (There was evidence that corroborated at least some of this information:  Mr. Gomez had told police three days after the burglary (after being arrested for a different crime on the same day as the burglary) that he worked at the flea market, went to the movie theatre the day before his arrest, and got free tickets to the theatre from someone while he was there.)  At trial, Ms. Vu did not identify Mr. Gomez and instead stated that she did not think defendant was the man who gave the tickets to her, although she also indicated she could not really remember.  *Compare* RT 42 ("I don't know over time he change, I don't know.  But, yes, I can exclude him") *and* RT 43 ("I don't think that's him") *with* RT 37 ("I seriously don't remember how he look like") *and* RT 38 (the defendant in court is either in photo # 2 or photo # 4 of the photo lineup).  Ms. Vu also testified, however, that she had told Detective Mitchell the truth, and she told him that the person in photo # 4 looked like the man who sold her the tickets but she would have to see him in person to be sure.  RT 39. ).  Ms. Vu was a reluctant trial witness; she

22

did not want to testify and only appeared because she had been subpoenaed.  RT 39.  Detective Mitchell testified that Ms. Vu looked at the photos, said that photo # 4 "looks like the guy, but I w'd have to see him in person," and circled photo # 4.  RT 59-60.  Detective Mitchell had spoken to Ms. Vu nine months before the trial and showed her the photos in which Mr. Gomez was in photo # 4.  RT 56.  Detective Mitchell also testified that Ms. Vu was not hesitant in her selection of photo # 4.  RT 60.  According to Detective Mitchell, Mr. Gomez's appearance had changed over the several months before trial,  Detective Mitchell testified that, since first coming into contact with Detective Mitchell before his arrest, Mr. Gomez had grown "quite a bit heavier," now wore a different hairstyle, now wore glasses, and had shaved his facial hair.  RT 53-54.  It was the responsibility of the trier of fact, not this Court, to decide whether to credit Ms. Vu's selection of Mr. Gomez's picture from the photo lineup over her in-court exclusion of him as the person who gave her the stolen movie tickets.  *See Jackson*, 443 U.S. at 326 (reviewing court must presume evidentiary conflict resolved in favor of prosecution).

Based on the DNA evidence, plus the testimony from the victim, Ms. Vu and Detective Mitchell, a rational trier of fact could have found that Mr. Gomez committed the burglary, robbery and false imprisonment on September 13, 2008.  Viewing the evidence in the light most favorable to the prosecution, the DNA evidence put Mr. Gomez in the victim's bedroom, the victim identified Mr. Gomez as resembling the person she saw in her bedroom, and Ms. Vu had picked Mr. Gomez out of a photo line-up as the man who gave her the movie tickets stolen from the residence.  There was sufficient evidence to support the trier of fact's conclusion that Mr. Gomez was the perpetrator of the robbery, burglary, and false imprisonment.  He is not entitled to the writ on this claim.

D.    Ineffective Assistance of Counsel Claims

   1.    Trial Counsel

      a.    Background

Mr. Gomez contends that trial counsel was ineffective in that she failed to investigate a potential alibi witness.  Mr. Gomez states that he told his defense counsel in about June 2010 that "he had been home with his girlfriend, Laura Cordova, the entire night" and that his father could

contact Ms. Cordova, who was "currently in rehab." Docket No. 1 at 35. A couple of months later, Mr. Gomez and counsel again discussed his whereabouts on the night of the burglary. Defense counsel told him that "it wouldn't do any good to talk with Ms. Cordova, as the police report filed by Detective Mitchell indicated that she had stated that Mr. Gomez had not been home that night." *Id.* at 35-36. Mr. Gomez asserts that, if counsel had contacted Ms. Cordova, counsel would have learned that Ms. Cordova had told Detective Mitchell that Mr. Gomez had "been home the entire night" and counsel could have called Ms. Cordova as a witness to rebut the police report that stated otherwise. *Id.* at 36.

Mr. Gomez also alleges that counsel was ineffective in failing to investigate the documents that indicated that one of the buccal swabs was missing and failed to notice "the impropriety evident in the e-mails between Detective Mitchell and Ryan Vachon until nearly the end of the trial process." *Id.*

The Santa Clara County Superior Court rejected the ineffective assistance claims on the merits. The superior court found it unnecessary to decide whether counsel's conduct amounted to deficient performance because Mr. Gomez had failed to establish prejudice from the alleged errors. First, the court rejected the claim that counsel was ineffective in not investigating and presenting evidence about the buccal swab discrepancy, because prejudice was not established.

> Even assuming there was an issue as to the chain of evidence, Petitioner has made an insufficient showing that cross-examining Vachon would have revealed this issue and makes no claims that Vachon would have any knowledge as to the chain of custody of the buccal swabs before reaching Vachon.
>
> Even were this Court to assume that cross-examining Vachon would have revealed an issue to the chain of custody of the buccal swab, and even assuming this evidence would have cast doubt on the reliability of the evidence of Petitioner's DNA being found on the sock in the victim's residence, Petitioner has not established there would have been a reasonable probability of a different outcome. Petitioner's DNA was also found on the knife which was recovered and identified by the victim as the knife that went missing on the night of the incident. Second, there was evidence presented at trial that Ms. Vu had at one time identified Petitioner as the man who gave her the movie tickets which were missing from the victim's house after the night of the incident.

Docket No. 1 at 166.

1    Next the superior court rejected the claim that trial counsel was ineffective in not

2    investigating Ms. Cordova as an alibi witness; even if one assumed that Ms. Cordova had been

3    interviewed and called to testify as an alibi witness, the court concluded Mr. Gomez had not

4    shown prejudice from the alleged error of counsel.

> Assuming the DNA evidence on the sock was not presented at trial,
> and assuming Ms. C[o]rdova testified as an alibi witness on behalf
> of Defendant, there remained DNA evidence from the handle of the
> knife linking Defendant to the incident and circumstantial evidence
> of Ms. Vu having previously identified Defendant as the person who
> gave her the movie tickets which were missing from the victim's
> residence. Further, because Ms. C[o]rdova was previously
> Defendant's girlfriend, Ms. C[o]rdova may have not been deemed
> credible by the trial court.

*Id.* at 167.

b.    Analysis

The Sixth Amendment's right to counsel guarantees not only assistance, but effective

assistance, of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The benchmark for

judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper

functioning of the adversarial process that the trial cannot be relied upon as having produced a just

result. *Id.* In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, a petitioner

must establish two things. First, he must demonstrate that counsel's performance was deficient

and fell below an "objective standard of reasonableness" under prevailing professional norms. *Id*

at 687-88. Second, he must establish that he was prejudiced by counsel's deficient performance,

i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result

of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability

sufficient to undermine confidence in the outcome. *Id.*

A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of

counsel claims under § 2254. *See Cullen v. Pinholster*, 563 U.S. 170, 202 (2011). The "question

is not whether counsel's actions were reasonable. The question is whether there is any reasonable

argument that counsel satisfied *Strickland*'s deferential standard." *Harrington v. Richter*, 562 U.S.

86, 105 (2011).

The Santa Clara County Superior Court's rejection of Mr. Gomez's ineffective-assistance-

of-counsel claim was not contrary to, or an unreasonable application of *Strickland*.  The superior court identified *Strickland* as the controlling law, *see* Docket No. 1 at 164, and reasonably applied it.  *Strickland* permits a court – as the superior court did here -- to reject a claim on the prejudice prong without first determining whether there was deficient performance.  *See Strickland*, 466 U.S. at 697.  It was not unreasonable for the superior court to find that Mr. Gomez had failed to show prejudice as to both the failure to pursue the buccal swab discrepancy and the failure to investigate and present the alibi witness.  The superior court reasonably determined that the DNA on the knife plus Ms. Vu's identification of Mr. Gomez in the photo lineup were too powerful to be overcome even if Mr. Gomez had presented evidence about a chain of custody problem with the buccal swab and the testimony of his girlfriend as an alibi witness.  Evidence of a problem with the chain of custody for the buccal swab would only have gone to the weight of the evidence that the DNA on the sock was his DNA, and not to the admissibility of that evidence.  *See Melendez-Diaz*, 557 U.S. at 311 n.1 (gaps in the chain of custody of evidence normally go to the weight of the evidence rather than its admissibility).  As explained in Section A above, Mr. Gomez's theory that the buccal swab discrepancy showed that DNA had been planted on the sock is unfounded speculation.  And, as noted by the superior court, alibi witnesses who are in romantic relationships with defendants sometimes are not seen as credible alibi witnesses in the trial courts.  Further, regardless of counsel's nonpresentation of the buccal swab evidence and the alibi witness, the presence of Mr. Gomez's DNA on the knife and Ms. Vu's identification of him in the photo lineup firmly connected him to the burglary.  In this case, where the central question was whether Mr. Gomez was the perpetrator, the fact that his DNA was on one item (i.e., the knife) taken from the residence and that a witness independently identified him as the man who gave her other items (i.e., movie tickets) taken from the residence squarely showed him to be the perpetrator.

Despite Mr. Gomez's efforts to suggest that counsel did not critically examine the DNA evidence, this is not a case in which the DNA evidence was accepted at face value by trial or appellate counsel.  The record indicates that both attorneys looked at the DNA evidence and reasonably saw it as presenting too great an obstacle to overcome.  In a letter from trial counsel to appellate counsel, trial counsel responded to several questions about trial decisions.  Docket No. 1

United States District Court
For the Northern District of California

at 74-79.  In response to a request for an explanation of why counsel had stipulated to Ms. Burley testifying regarding the DNA analysis instead of demanding that Mr. Vachon do it, trial counsel explained that she had "consulted with Dr. Simon Ford of Lexigen Inc, San Francisco, CA with respect to the DNA evidence in Mr. Gomez' case.  After meeting with Dr. Ford and his assistant [she] was satisfied that the DNA evidence (collection and interpretation) had no issues as to its reliability and usefulness in allowing the prosecution to make their identity assertion as to Mr. Gomez having been the contributor to the mixed and non-mixed profiles collected from the knife and sock respectively and discovered by police." *Id.* at 75.  Trial counsel explained that she was aware of Mr. Gomez's right to confront and cross-examine the actual analyst; however, "as there was no issue as to the scientific evidence and its reliability as well as the fact that we were in a bench trial, the matter of having the actual criminalist come in to testify seemed unnecessary." *Id.* Trial counsel had Dr. Ford sit through and consult with her during Ms. Burley's testimony to look for any problems, and they encountered none. *Id.* at 77.  Trial counsel also had spoken with Mr. Vachon "via telephone and was satisfied based upon that conversation as to his protocol in the analysis of the biological evidence in this case." *Id.*  Trial counsel also noted that, although Mr. Gomez had asserted that he was never in the residence, "[h]e was equally unable to assist [her] in developing a reasonable explanation as to why his biological material was found on items within her home as well as items belonging to Ms. Von Stockhausen found outside of her home." *Id.* at 74

Mr. Gomez argues that the DNA on the knife was not enough to get the case filed, and urges that Detective Mitchell even acknowledged that fact in email # 5.  This argument does not defeat the superior court's prejudice analysis because the argument fails to account for the separate and additional evidence of Ms. Vu's identification of Mr. Gomez as the source of the stolen movie tickets.  At the time Detective Mitchell wrote that email, Ms. Vu had not yet been shown the photo lineup from which she selected Mr. Gomez's picture.  The state court reasonably could have thought it highly improbable that anyone but the perpetrator of the burglary would be connected to the crime both by Ms. Vu's identification and the DNA evidence.  This is especially so because the DNA on the knife was matched to Mr. Gomez's DNA in an existing database, and that match

United States District Court
For the Northern District of California

1    had been made more than two months before Mr. Gomez provided the buccal swabs to the police.

2            2.        Appellate Counsel

3            In addition to claiming that trial counsel was ineffective for not discovering and pursuing

4    the buccal swab discrepancy, Mr. Gomez also claims that appellate counsel was ineffective in that

5    she failed to see that the chain of custody problem and the "impropriety evident in the e-mails

6    constituted a 'dead bang' cause for dismissal."  Docket No. 1 at 38-39.

7            The superior court rejected Mr. Gomez's claim that appellate counsel had been ineffective.

8    "Because there were no arguable issues on appeal, Petitioner's appellate counsel was not deficient

9    and Petitioner has also failed to demonstrate that he was prejudiced by any alleged deficient

10   performance."  Docket No. 1 at 169.

11           The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the

12   effective assistance of counsel on his first appeal as of right.  *See Evitts v. Lucey*, 469 U.S. 387,

13   391-405 (1985).  The filing of a *Wende* brief does not itself deprive a criminal defendant of his

14   Fourteenth Amendment right to effective assistance of appellate counsel.  *See Smith v. Robbins*,

15   528 U.S. 259, 276 (2000).  In cases with fully briefed appeals and in cases with *Wende* briefs,

16   claims of ineffective assistance of appellate counsel are reviewed according to the standard set out

17   in *Strickland*.  *See Smith,* 528 U.S. at 285.  In the *Wende* brief context, the petitioner must first

18   show that counsel was objectively unreasonable in failing to find arguable issues of appeal, i.e.,

19   unreasonably failed to discover nonfrivolous issues and failed to file a merits brief raising them.

20   *Smith*, 528 U.S. at 285.  Second, the petitioner must demonstrate prejudice, i.e., a reasonable

21   probability that, but for counsel's unreasonable failure to file a merits brief, the petitioner would

22   have prevailed on appeal.  *See id.*

23           Just as the superior court reasonably determined that Mr. Gomez failed to show prejudice

24   for claim of ineffective assistance of trial counsel based on the failure to investigate and present

25   the buccal swab evidence, the superior court also reasonably determined that Mr. Gomez failed to

26   show any prejudice resulting from appellate counsel's alleged failure to investigate and present

27   argument about the buccal swab evidence.  *Cf. Moormann v. Ryan*, 628 F.3d 1102, 1106-07 (9th

28   Cir. 2010) (to determine whether appellate counsel was ineffective in not presenting a claim on

1    appeal, court first assesses the merits of the underlying claim).  *See generally Rupe v. Wood*, 93

2    F.3d 1434, 1445 (9th Cir. 1996) (failure to take a futile action can never be deficient performance).

3    Finally, far from being the "'dead bang' cause for dismissal" envisioned by Mr. Gomez, the buccal

4    swab inconsistencies only would have gone to the weight of the DNA evidence, only suggest a

5    speculative claim that evidence was planted, and would not have affected the powerful

6    incriminating fact of his DNA on the knife because the knife was tested before the buccal swabs

7    were obtained.  The superior court's rejection of this claim was not an unreasonable application of

8    Supreme Court precedent.

9    E.    Cumulative Error Claim

10          Mr. Gomez contends that the cumulative effect of several errors warrants reversal.  In

11   some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the

12   cumulative effect of several errors may still prejudice a defendant so much that his conviction

13   must be overturned. *See Alcala v. Woodford,* 334 F.3d 862, 893–95 (9th Cir. 2003) (reversing

14   conviction where multiple constitutional errors hindered defendant's efforts to challenge every

15   important element of proof offered by prosecution).  Here, there were not multiple trial errors to

16   accumulate.  Mr. Gomez therefore is not entitled to relief under the cumulative error doctrine.

17   F.    No Certificate of Appealability

18          A certificate of appealability will not issue.  *See* 28 U.S.C. § 2253(c).  This is not a case in

19   which "jurists of reason would find it debatable whether the petition states a valid claim of the

20   denial of a constitutional right and that jurists of reason would find it debatable whether the

21   district court was correct in its procedural ruling" as to the first claim.  *Slack v. McDaniel*, 529

22   U.S. 473, 484 (2000). And, as to the second claim, this is not a case in which "reasonable jurists

23   would find the district court's assessment of the constitutional claims debatable or wrong." *Id.*

24   Accordingly, a certificate of appealability is **DENIED**.

25   ///

26   ///

27   ///

28   ///

United States District Court
For the Northern District of California

## VI.     CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is **DENIED** on the merits. The Clerk shall close the file.

**IT IS SO ORDERED**.

Dated: March 7, 2016

_____
EDWARD M. CHEN
United States District Judge